# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GEORGE POTZNER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BAYER CROPSCIENCE LP; BAYER CROPSCIENCE, INC.; CORTEVA INC.; CARGILL INCORPORATED; BASF CORPORATION; SYNGENTA CORPORATION; WINFIELD SOLUTIONS, LLC; UNIVAR SOLUTIONS, INC.; PIONEER HI-BRED INTERNATIONAL, INC.; FEDERATED CO-OPERATIVES LTD.; CHS INC.; NUTRIEN AG SOLUTIONS INC.; GROWMARK INC.; SIMPLOT AB RETAIL SUB, INC.; AND TENKOZ INC.,

Defendants.

Case No.


**CLASS ACTION COMPLAINT**


**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................... 1

II.   JURISDICTION AND VENUE ............................................................................. 4

III.  PARTIES ................................................................................................................ 5

      A.    Plaintiff ..................................................................................................... 5

      B.    The Manufacturer Defendants .................................................................. 5

      C.    The Wholesale Defendants ....................................................................... 6

      D.    The Retailer Defendants ........................................................................... 7

IV.   TRADE AND COMMERCE .................................................................................. 8

V.    THE RELEVANT MARKETs ............................................................................... 8

VI.   FACTUAL ALLEGATIONS ................................................................................. 9

      A.    Crop Input Industry Background .............................................................. 9

      B.    The Crop Inputs Market is Characterized by a Lack of Pricing and Industry
            Transparency, Which Defendants Capitalize on in their Business Practices ................ 9

      C.    The Rise of Electronic Crop Inputs' Sales Platforms Threatened Defendants'
            Operations by Increasing Transparency of Pricing and Access to Crop Inputs ......... 11

      D.    Faced with the Threat of Electronic Crops Inputs Sales Platforms, Defendants
            Conspired with One Another to Restrict the Electronic Platforms' Ability to
            Successfully Compete in the Crop Inputs Market ..................................................... 12

      E.    The Structure and Characteristics of the Crop Inputs Market Render the Conspiracy
            Economically Plausible ............................................................................ 18

      1.    The Crop Inputs Market is Highly Concentrated ..................................... 18

      2.    Defendants Had Many Opportunities to Conspire .................................... 18

      3.    Defendants Are Recidivist Antitrust Violators ........................................ 19

      4.    Defendants' Actions Were Against Their Economic Interests ................. 20

      F.    The Crop Inputs Market is the Subject of Multiple Government Investigations ........ 21

VII.  ANTITRUST IMPACT .......................................................................................... 22

VIII. ANTITRUST INJURY .......................................................................................... 22

IX.    CLASS ACTION ALLEGATIONS ......................................................................... 23

X.    STANDING TO SEEK RELIEF ............................................................................. 25

XI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ................................... 26

XII.    CAUSES OF ACTION ........................................................................................ 27

XIII.    PRAYER FOR RELIEF ...................................................................................... 30

XIV.    DEMAND FOR JURY TRIAL ............................................................................. 31

Plaintiff George Potzner brings this action on behalf of himself and all persons or entities in the United States who purchased a Crop Input (defined below) from a Defendant or a retailer other than a Retailer Defendant between January 1, 2014 and the present (the "Class Period"). Plaintiff brings this action for treble damages under the antitrust laws of the United States against Defendants and demands a trial by jury.

## I.    NATURE OF THE ACTION

1.    The market for "Crop Inputs"—seeds and crop protection chemicals such as fungicides, herbicides, and insecticides—used by American farmers is one of the largest markets in the world with annual sales in excess of $65 billion.

2.    This market is dominated by: (1) four major manufacturers, Defendants Bayer CropScience Incorporated ("Bayer"), Corteva Incorporated ("Corteva") and its subsidiary Pioneer Hi-Bred International, Inc. ("Pioneer"), Syngenta Corporation ("Syngenta"), and BASF Corporation ("BASF") (collectively, the "Manufacturer Defendants"); (2) three large wholesalers, Defendants Cargill Incorporated ("Cargill"), Winfield Solutions, LLC ("Winfield"), Univar Solutions, Incorporated ("Univar") (collectively, the "Wholesaler Defendants"), that control the distribution of Crop Inputs to farmers; and (3) retailers, including Defendants CHS Incorporated ("CHS"), Nutrien Ag Solutions Incorporated ("Nutrien"), GROWMARK, Incorporated ("Growmark"), Simplot AB Retail Sub, Incorporated ("Simplot"), Tenkoz Incorporated ("Tenkoz"), and Federated Co-operatives Limited ("Federated") (collectively, the "Retailer Defendants").[1]

---

[1]    The Manufacturer Defendants, the Wholesaler Defendants, and the Retailer Defendants are referred to in this Complaint collectively as the "Defendants."

3.    Historically and through the present, the distribution and sale process for Crop Inputs enable the market participants to maintain supra-competitive prices in part by denying farmers accurate product information, including pricing information, which would allow them to make fully-informed purchasing decisions. As a result, the average price American farmers pay for Crop Inputs is increasing at a rate that dramatically outpaces yields.

4.    For example, over the last 20 years, the price of seed corn rose 300%, while corn yields increased only 33% to 35%. In 1989, U.S. farms spent $15.6 billion overall on chemicals, fertilizer, and seeds. This rose to $59 billion in 2019, outpacing inflation by 60%. Crop Inputs have consequently increasingly constituted a larger share of farm budgets. In 1989, Crop Inputs constituted 12.6% of farm expenditures; by 2019, Crop Inputs constituted 16.4% of farmer spending. These increases are proving devastating to farmers, who are now the least profitable level of the American food supply chain. Farmers are being forced into bankruptcy at a record pace.

5.    Recognizing these inefficiencies, several electronic Crop Inputs sales platforms were launched in the past decade. These electronic platforms aimed to provide a cheaper, more transparent way for farmers to buy Crop Inputs, circumventing the existing opaque, convoluted distribution system. For example, Farmers Business Network ("FBN"), a leading electronic sales platform and Silicon Valley startup, was extremely popular with farmers upon launch and has successfully raised millions of dollars from leading venture capital firms to build out capacity to meet that demand.

6.    These new platforms threatened Defendants' dominant market positions and control over pricing. As a result, rather than compete fairly with the electronic platforms, Defendants conspired to block the platforms' access to Crop Inputs by engaging in a group boycott.

2

For instance, the Manufacturer, Wholesaler, and Retailer Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN, even though doing so would have opened a significant new sales channel for any individual manufacturer, wholesaler, or retailer acting independently and would have been in Defendants' unilateral best economic interests. To ensure that this boycott was successful, the Manufacturer Defendants imposed strict penalties on retailers who made sales to FBN. Similarly, certain manufacturers audited authorized retailers to ensure that electronic platforms were not securing branded Crop Inputs by buying from an authorized retailer.

7.      When FBN attempted to circumvent this unlawful boycott by purchasing an established retailer with existing supply agreements, Defendants canceled the retailer's existing supply contracts, starving FBN's platform of the Crop Inputs it needed to operate.

8.      Given the structure of the Crop Inputs industry, with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual agreement, coordination, and cooperation among Defendants. Absent such an agreement, Defendants' actions were against their independent economic self-interests.

9.      In early 2020, it was revealed that Canada's Competition Bureau ("CCB") has been investigating this conduct. According to documents filed by CCB, it is understood that Defendants refused to supply or restricted supply of Crop Inputs to FBN and engaged in coordinated behavior in relation to FBN. The United States Department of Justice is reportedly monitoring CCB's investigation.

10.      As a result of Defendants' misconduct, farmers remain trapped in an inefficient, opaque Crop Inputs market and have paid more for Crop Inputs than they would have in a

competitive market. Plaintiffs and the Classes bring this antitrust suit to redress that wrongful conduct.

## II.    JURISDICTION AND VENUE

11.    Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover actual and compensatory damages, treble damages, interest, costs, and attorneys' fees for the injury caused by Defendants' wrongful conduct. Plaintiffs also bring state law class claims on behalf of the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.

12.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy for each Class exceeds $5,000,000 and members of each Class are citizens of a different state than Defendants.

13.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

14.    This Court also has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Crop Inputs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had

a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

15.    The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

### III.    PARTIES

#### A.  Plaintiff

16.    Plaintiff George Potzner is a citizen of the State of Iowa. During the Class Period, Plaintiff Potzner purchased Crop Inputs, including herbicides manufactured by BASF, at supra-competitive prices from a retailer other than a Retailer Defendant.

#### B.  The Manufacturer Defendants

17.    Bayer AG is a multinational agricultural, pharmaceutical, and chemical company. It is organized into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

18.    Defendant Bayer CropScience Incorporated is a wholly-owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

19.    Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

20.    Bayer CropScience Incorporated and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science Division.

21.     Defendant Corteva Incorporated is a Delaware corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

22.     Defendant Pioneer Hi-Bred International, Inc. is an Iowa corporation headquartered in Johnston, Iowa, that develops, manufactures, and sells Crop Inputs in the United States. Pioneer is a wholly-owned subsidiary of Manufacturer Defendant Corteva.

23.     Defendant BASF Corporation is a Delaware corporation headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

24.     Defendant Syngenta Corporation is a Delaware corporation and is the main U.S.-based operating subsidiary of Syngenta AG. It is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

### C. The Wholesale Defendants

25.     Defendant Cargill, Incorporated is a Delaware corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to other retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

26.     Defendant Winfield Solutions, LLC is a Delaware corporation headquartered in Arden Hills, Minnesota. Winfield is a Crop Inputs wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield is also a major Crop Inputs retailer that operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

27.    Defendant Univar Solutions, Incorporated is a Crop Inputs wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar is a domestic corporation headquartered in Illinois and incorporated in Delaware.

### D.  The Retailer Defendants

28.    Defendant CHS Incorporated is one of the largest Crop Inputs wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick and mortar stores. CHS is incorporated and headquartered in Inver Grove Heights, Minnesota.

29.    CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing them to purchase and distribute Crop Inputs and entitling them to special rebates.

30.    Defendant Nutrien Ag Solutions, Inc. is both a Crop Inputs wholesaler and the largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien is incorporated in Delaware and has its principal place of business in Colorado.

31.    Defendant GROWMARK, Incorporated, d/b/a Farm Supply or FS, is a large Crop Inputs retailer headquartered in Illinois, with brick and mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs, and entitling it to special rebates.

32.    Defendant Tenkoz Inc. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States

annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

33.     Defendant Simplot AB Retail Sub, Incorporated, f/k/a Pinnacle Agriculture Distribution, Incorporated, is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

34.     Defendant Federated Co-operatives Ltd. is a large Crop Inputs retailer. It maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in anticompetitive practices in the Crop Inputs market.

## IV.     TRADE AND COMMERCE

35.     Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

36.     During the Class Period, Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## V.     THE RELEVANT MARKETS

37.     This action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

38.     The relevant geographic market is the United States.

## VI.    FACTUAL ALLEGATIONS

### A.  Crop Input Industry Background

39.    Farmers in the United States are facing an existential crisis, with operating expenses skyrocketing while yields remain stagnant. At their peak prices in 2014, input costs jumped 67.5% for planting soybeans, 72.1% for planting corn, and 56.3% for planting cotton, compared to the respective input costs in 1995, while yields for soybeans and corn—the two most planted field crops in the United States—increased by only 18.9% and 29.7%, respectively, between 1995 and 2011. Indeed, since 1996, total production costs of corn has nearly doubled.

40.    In a 2018 survey, 80% of farmers reported that their costs continued to increase, and many farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019. The rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

41.    This steady cost increase is not attributable to escalating research and development expenditures, which have, in fact, decreased considerably. Rather, it is the result of unjustifiable increases in the prices farmers pay for Crop Inputs—the seeds and chemicals such as fertilizer, insecticides, and herbicides used to produce a crop—and the supra-competitive prices paid by farmers as a result of Defendants' wrongful conduct, including, but not limited to, their group boycott of electronic distribution platforms.

### B.  The Crop Inputs Market is Characterized by a Lack of Pricing and Industry Transparency, Which Defendants Capitalize on in their Business Practices

42.    These inflated prices persist—and wreak financial havoc on America's farmers—by Defendants' design. The Crop Inputs market is structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about Crop Inputs purchases. Farmers are unwittingly paying more

for Crop Inputs than they would in a truly competitive market. Farmers lack the objective information and data needed to gauge whether their investments are worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers and other costs.

43.    This opacity begins at the top of the Crop Inputs market, where the Manufacturer Defendants, who closely guard their prices, develop and produce between 75% and 90% of the most popular Crop Inputs.

44.    To maintain that secrecy, Manufacturer Defendants allow only wholesalers, including the Wholesaler Defendants, retailers the manufacturers own or operate, and retailers such as the Retailer Defendants that are licensed "authorized retailers" to sell the Manufacturer Defendants' Crop Inputs.

45.    The Manufacturer Defendants' contracts granting "authorized retailer" licenses contain strict confidentiality provisions that require, *inter alia*, authorized retailers to keep confidential the manufacturers' prices, as well as any incentives, rebates, and commissions.

46.    Manufacturer Defendants also use a tactic known as "seed relabeling" to capitalize on farmers' lack of objective performance data. Seed relabeling is the practice of taking seeds that have been on the market under a given brand name for some time and repackaging the seeds under a new brand name so that they can be sold at a higher price, even though the seeds are the same.

47.    Pricing is no more transparent at the retail level. Wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose to customers the price paid to the wholesaler for their Crop Inputs or the price at which retailers sell those Crop Inputs to other farmers. To further muddy the market waters, retailers sell Crop Inputs and related services (*e.g.*, spraying or applying chemicals) in bundles, making it difficult—if not

impossible—for farmers to discern the price they are charged for any individual Crop Input or service.

### C. The Rise of Electronic Crop Inputs' Sales Platforms Threatened Defendants' Operations by Increasing Transparency of Pricing and Access to Crop Inputs

48.    Recognizing the inefficiency of an opaque Crop Inputs market, electronic Crop Inputs sales platforms began emerging in the past decade with the goal of modernizing the market by, among other things, providing farmers with transparent pricing and access to Crop Inputs directly from the Manufacturer Defendants, avoiding the opaque distribution system controlled by the Wholesaler and Retailer Defendants.

49.    At first, those efforts showed extraordinary promise, as farmers gravitated en masse toward these electronic platforms in search of better, fairer prices. More than 12,000 farmers signed up for FBN's service that provides objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic platform that was designed to sell Crop Inputs online. FBN overall has over 21,000 members, and most recently raised $250 million in Series F funding to continue its efforts "to improve the profitability of farming families . . . for generations to come."

50.    The success of electronic platforms drew negative attention from the Wholesaler and Retailer Defendants, who recognized that these new entrants threatened not only their traditional roles in the Crop Inputs market but also their profit margins. FBN, as an example, particularly stands out because of its popularity and potential to significantly disrupt traditional Crop Inputs supply and pricing.

51.    A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained: "Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency

for product prices." That price transparency would allow farmers to negotiate more effectively with Crop Inputs retailers, thus eating into the retailers' margins.

### D. Faced with the Threat of Electronic Crops Inputs Sales Platforms, Defendants Conspired with One Another to Restrict the Electronic Platforms' Ability to Successfully Compete in the Crop Inputs Market

52.     Upon learning about FBN's 2016 entry into the U.S. market as an electronic Crop Inputs sales platform, CHS officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that although an electronic platform like FBN would be able to offer the same products at cheaper prices: "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

53.     Additionally, in 2016, Defendant Bayer secretly formed an internal task force specifically to study the long-term competitive impact of FBN's electronic platform.

54.     On February 2, 2016, CropLife magazine, a trade publication published by CropLife America (a trade association composed of the major Crop Inputs manufacturers, wholesalers, and retailers), echoed CoBank's sentiments, and wrote repeatedly about the danger of electronic platforms posed to Crop Inputs retailers' business model. CropLife stated that it was "concerned that the retailer could be disintermediated—a fancier and less draconian way of saying [electronic platforms would] 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried "the devil known as 'price transparency,'" commenting that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

55.     In the same February 2, 2016 article, CropLife magazine criticized another electronic platform, XSAg.com ("XSAg") (currently known as FarmTrade, LLC or

FarmTrade.com), one of the original electronic platform trailblazers that had launched to offer "a virtual playing field" for the purchase and sale of certain Crop Inputs electronically, essentially operating as a trading platform. CropLife described XSAg's entry as a "punch [that] came out of the shadows and landed a nasty body blow" to threat retailers, further noting that "[c]rop protection manufacturers and the distribution channel eventually figured out how to do battle with the pricing revelations XSAg brought to the market, but it was [an] unnerving and unhappy time."

56.    In late fall 2017, CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—explicitly called out the threat posed by electronic platforms to retailers and wholesalers at its annual meeting. CropLife's coverage of the event reported that "three letters … continually cropped up no matter what the topic of conversation happened to be—FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products." One PACE Council member observed, "I think it would be crazy, stupid to ignore [FBN]. Even if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."

57.    In February 2018, CropLife reported on a local "huge price war in chemicals" in Iowa in 2017 as a result of FBN competing in the market. A retailer competing with FBN urged that "'ag retailers need to get proactive' in dealing with the threat of disintermediation." Another retailer noted that "as we get more competitive with the FBNs of the world, we'll obviously have to cut back on services and support (at times). But what concerns me is when ... the legal

implications of that is you are a big business now and the regulatory burden becomes more significant."

58.    Defendants had a strong motive to conspire to preserve their opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep their prices confidential or maintain price opacity through seed relabeling and bundling.

59.    The Retailer Defendants and the Wholesaler Defendants, to retain their dominant market positions and supracompetitive profit margins, had to exclude electronic platforms from the market. They conspired to cut off the platforms' product supply. Because the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers, the Retailer and Wholesaler Defendants had to convince the Manufacturer Defendants to agree not to supply FBN and other platforms in order to make the boycott effective.

60.    Subsequently, starting in 2016, after FBN entered the market, the Manufacturer Defendants complied with the Retailer and Wholesaler Defendants' demands and initiated a joint boycott of electronic platforms, including FBN, the target of CropLife's report. As a result, when FBN reached out to the Manufacturer and Wholesaler Defendants for Crop Inputs, they refused to supply FBN, offering pretextual excuses for their refusal.

61.    For example, in fall 2018, after Syngenta's Head of Crop Protection Sales in the U.S. learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, he falsely claimed that electronic platforms would deliver counterfeit products. He further claimed that "[w]hen online entities acquire products from sources

14

other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

62.    The Manufacturer Defendants refused to supply seed and pesticide products to FBN and did not allow the electronic platform to sell products crucial to the U.S. Farm Belt, such as Syngenta's Force insecticide and Corteva's Pioneer corn seed.

63.    To ensure that their boycott was successful, Defendants imposed strict penalties on retailers who failed to comply. For example, in March 2018, after learning that some retailers had sold seed and spray products to FBN despite the boycott, Syngenta initiated an audit of its authorized retailers and brokers to identify and punish those that had made the sales. Syngenta's Head of U.S. Crop Protection Sales wrote to sellers, "We have concerns about product integrity, stewardship, and regulatory compliance."

64.    Bayer, BASF, and Corteva similarly include mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not secure branded Crop Inputs by buying from an authorized retailer.

65.    This backlash extended to generic products (Crop Inputs that no longer retain patent protection). A June 2018 Forbes article reported that some generic chemical products manufacturers were holding back on supplying FBN because they are "wary of angering their existing sales channels [i.e., wholesalers and retailers]." One generic products manufacturer CEO confirmed that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."

66.     FBN has attempted to circumvent Defendants' boycott in the U.S. by relying on brokers, who sometimes have excess inventory to offload, in order to obtain name-brand Crop Inputs to sell to American farmers. However, obtaining such inventory often comes at higher costs than those paid by other retailers that are able to buy directly from manufacturers—which inhibited FBN's ability to effectively bring price competition to the sector.

67.     On March 27, 2018, in an attempt to combat Defendants' boycott, FBN announced its purchase of Yorkton Distributors Ltd. ("Yorkton"), a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. These agreements, if honored, would have provided FBN with Crop Inputs inventory which it could sell to farmers at competitive prices.

68.     Before purchasing Yorkton, FBN asked manufacturers whether they would continue to supply Yorkton with their products if FBN purchased it, and "no one indicated they'd be disfavorable."[2]

69.     Yet after FBN's purchase, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they continued supplying Crop Inputs to Yorkton. On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned that the new competitor would upend their business models, writing, "How our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada."[3]

70.     Less than a week later, on April 6, 2018, Univar emailed retailers saying that it would refuse to supply its products to Yorkton or FBN, and warning that the new competition

---

[2] https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (last accessed June 2, 2021).
[3] *Id.*

would decrease profit margins in the industry. Univar had informed FBN that Univar would no longer conduct business with the company beyond July 31, 2018, warning retailers, in part: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing[.] … If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out."[4] Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."[5]

71.    Faced with threats of retaliation from wholesalers and retailers, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within months of its March 2018 acquisition by FBN, causing Yorkton to lose two-thirds of its branded products. Bayer, Corteva, and Cargill informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, to Yorkton.

72.    In the U.S., FBN has been unable to sell name-brand Crop Inputs with the exception of occasional excess products purchased from brokers. As a result, FBN is only able to rely on suppliers of generic Crop Inputs, but many farmers have concerns about generic products' quality and will not purchase generics. Additionally, the effect of Defendants' wrongful conduct has extended into the generic market, further stifling FBN's options. FBN, starved of Crop Inputs, has since begun developing its own products, including seeds, herbicides, and insecticides, to sell to farmers through its electronic platform. Due to Defendants' conduct, FBN, as of August 2020, has yet to turn a profit.

---

[4] https://www.producer.com/news/competition-bureau-investigates-major-crop-input-makers-sellers/ (last accessed June 2, 2021).
[5] *Id.*

73.    As a result of the Retailer, Wholesaler, and Manufacturer Defendants' coordinated actions, farmers were deprived of the opportunity to purchase Crop Inputs at transparent, lower prices from electronic platforms. Instead, they are forced to continue paying artificially high prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements.

### E.    The Structure and Characteristics of the Crop Inputs Market Render the Conspiracy Economically Plausible

74.    Defendants' actions took place in the context of multiple plus factors that facilitated their conspiratorial agreement.

#### 1.    The Crop Inputs Market is Highly Concentrated

75.    The market for Crop Inputs is highly concentrated. BASF, Corteva, Syngenta, and Bayer AG dominate production in virtually every Crop Inputs category because they hold the patents for the genetic traits and crop protection chemicals that work best with popular branded seeds. As a result, they control 85% of the corn seed market, more than 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

#### 2.    Defendants Had Many Opportunities to Conspire

76.    Defendants had numerous opportunities for inter-firm communications to form and maintain their conspiracy through trade association participation.

77.    CropLife America is a trade association that comprises major Crop Inputs manufacturers, wholesalers, and retailers. CropLife's Board of Directors meets annually to discuss developments in the Crop Inputs market and has specifically discussed the entry of electronic platforms.

78.    CropLife's Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea, and previously Corteva's Suzanne

Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. Although CropLife America's long-time CEO claims that "the work of our Board of Directors is imperative to making sure that farmers have access to crop protection technology today and in the future," there is not a single representative from farming groups on CropLife America's Board of Directors. Instead, the Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion. No farming representatives are allowed to participate.

79.    The Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. Multiple employees from Defendants currently serve on the ARA Board, including Rod Wells, the current Board Chairman and the Chief Supply Chain Officer of Defendant GROWMARK. Notably, every single one of the Manufacturer Defendants was a "Platinum Sponsor"—the highest level sponsorship—at the 2019 annual conference (held in December 2019, shortly before such conferences were suspended due to COVID-19). These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

### 3.  Defendants Are Recidivist Antitrust Violators

80.    Competition experts have noted that past experience as participants in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading

recidivists," in which BASF and Bayer are among the top five leading antitrust recidivists. Corteva is also on the list and is among the top 40 leading antitrust recidivists.

### 4. Defendants' Actions Were Against Their Economic Interests

81.     Given the structure of the Crop Inputs market and industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott could only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base at the expense of its competitors by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

82.     For these reasons, absent an agreement among them, Defendants' actions were against their independent economic self-interest. For any one or more Defendants to provide Crop Inputs to electronic platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) simplified the distribution channel and permitted Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

### F. The Crop Inputs Market is the Subject of Multiple Government Investigations

83.　　Most recently, Defendants' exclusion of FBN drew the attention of the CCB, which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

84.　　In the course of the CCB investigation, on February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices.

85.　　Critically, and over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well. In January 2021, CCB filed an application seeking an order requiring three Bayer CropScience employees to be examined under oath or solemn affirmation by the Commissioner of Competition.

86.　　The United States Department of Justice is monitoring the CCB's investigation and is considering its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs. The Federal Trade Commission ("FTC") is also investigating anticompetitive conduct in the Crop Inputs market and issued a subpoena to at least one defendant,

Corteva. Corteva confirmed in a Form 10-Q filing that the FTC subpoenaed it "to submit documents pertaining to its crop protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its acetochlor, oxamyl and rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## VII.     ANTITRUST IMPACT

87.     Defendants' conduct has substantially impaired competition in the retail sale market for Crop Inputs by excluding electronic platforms, including FBN, from competing in that market.

88.     Defendants' conduct in boycotting and preventing electronic platforms from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury—suffered by both farmers and other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

## VIII.     ANTITRUST INJURY

89.     Plaintiffs and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

90.     By impairing competition in the retail sales market for Crop Inputs, and by excluding electronic platforms from competing in that market, Defendants have artificially raised the prices paid by purchasers for Crop Inputs, and ultimately the prices paid by consumers for farm products, including corn and grain.

## IX.    CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action on behalf of himself and as a class action under the provisions of Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of members of the following Plaintiff Classes:

> All persons or entities residing in the United States, including  its territories, that purchased a Crop Input manufactured by a Manufacturer Defendant during the Class Period; and

> All persons or entities residing in the United States, including its territories, that, purchased a Crop Input manufactured by a Manufacturer Defendant from a retailer other than a Retailer Defendant during the Class Period.

92.    Excluded from the Classes are Defendants; their officers, directors, management, employees, subsidiaries, affiliates, and coconspirators; and any persons or entities that purchased Crop Inputs solely for resale to others. Also excluded are any federal, state, or local governmental entities, any judicial officers presiding over this action; their law clerks and spouses; any persons within three degrees of relationship to those living in the judicial officers' household; and the spouses of all such persons.

93.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

94.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and members of the Classes were damaged by the same wrongful conduct of Defendants.

95.    Plaintiff will fairly and adequately protect and represent the interests of members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of members of the Classes.

23

96.    Plaintiff is represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation, including class actions involving group boycotts and conspiracy claims.

97.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Classes as a whole appropriate. Questions of law and fact common to members of the Classes include, but are not limited to:

      a.    Whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

      b.    Whether Defendants conspired to unreasonably restrain trade in violation of state unfair competition and antitrust laws;

      c.    The scope and duration of the alleged conspiracy;

      d.    Injury suffered by Plaintiff and members of the Classes;

      e.    Damages suffered by Plaintiff and members of the Classes; and

      f.    Whether Defendants have acted or refused to act on grounds generally applicable to members of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Classes as a whole.

98.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

99.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweigh potential difficulties in management of this class action.

100.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

101.    Plaintiff has defined members of the Classes based on currently available information and hereby reserves the right to amend the definition of members of the Classes, including, without limitation, the Class Period.

## X.    STANDING TO SEEK RELIEF

102.    The members of the Classes have purchased directly from a participant in the conspiracy in restraint of trade between the Manufacturer and Wholesaler Defendants and their Retailer Defendant co-conspirators, or from an authorized retailer that is in the control of the Manufacturer and Wholesaler Defendants by virtue of the terms of the authorized-retailer licenses dictated by the Manufacturer Defendants. As a consequence, the members of the Classes have standing to pursue damages inflicted by the conspiracies under Article III of the United States Constitution and Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

103.    By engaging in the conspiracy alleged in this Complaint, the Manufacturer Defendants, Wholesaler Defendants, and Retailer Defendants have maintained a market structure that benefits each of them at the expense of farmers. As the first purchasers injured by Defendants' anticompetitive conduct, Plaintiff and the members of the Classes have standing as direct purchasers under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

104.    The members of the Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because the conspiracies have inflicted or threatened to inflict harm on them, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

105.    The members of the Classes also have standing to seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is an actual, present, and justiciable controversy that has arisen between members of the Classes and all Defendants concerning whether Defendants and other co-conspirators have conspired in restraint of trade.

## XI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

106.    Any applicable statute of limitations for Plaintiffs and the Classes has been tolled with respect to any claims and rights of action that Plaintiffs and the Classes have as a result of the unlawful combination and conspiracy alleged in this Complaint. Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' and their co-conspirators' concealment of the conspiracy.

107.    Plaintiff and the Classes were not placed on actual or constructive notice of the conspiracy alleged herein until CCB made public its investigation and issued its subpoenas. More specifically, CCB's investigation made public allegations that Defendants refused to supply FBN with Crop Inputs and/or engaged in communications that are suggestive of coordinated behavior in relation to FBN. Group boycotts and other antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the Classes.

108.    As discussed above, the Crop Inputs market, from top to bottom, is structured to maximize opacity and deny purchasers access to the objective pricing data and product information farmers need to make informed decisions about the Crop Inputs they purchase. Further, the Manufacturer Defendants, Retailer Defendants, and Wholesaler Defendants use confidentiality provisions in their contracts to obscure and restrict disclosure of Crop Inputs prices. Defendants use additional tactics such as seed relabeling and bundle sales to further muddy the market waters

and prevent farmers, including Plaintiff and the Classes, from learning about the Crop Inputs market.

109.     Plaintiff and the Class could not have uncovered Defendants' conspiracy through the exercise of reasonable diligence. For one, Plaintiff and the Class do not have visibility into Defendants' pricing nor their distribution contracts which contain significant pricing-related terms. Additionally, Plaintiff and the Class are not members of the various boards and executive committees where the issues surrounding this complaint were discussed amongst Defendants.

## XII.    CAUSES OF ACTION

### COUNT I: CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

110.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

111.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs in the United States, in violation of Section I of the Sherman Act, 15 U.S.C. § 1.

112.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiffs and members of the Classes, principally but not exclusively, by jointly boycotting

27

entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

113. This conspiracy is a per se violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

114. Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

115. Plaintiff and members of the Classes directly purchased Crop Inputs from Defendants and their co-conspirators at supra-competitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

116. Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

117. Plaintiff and members of the Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

118. Plaintiff and members of the Classes are entitled to recover for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II: IOWA COMPETITION LAW
## IOWA CODE §§ 553.1, *ET SEQ.*

119.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

120.     The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices."

121.     Members of the Classes purchased Crop Inputs within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

122.     Defendants contracted, combined, or conspired to restrain or monopolize trade in the market for Crop Inputs, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing, or maintaining prices for Crop Inputs, in violation of Iowa Code §§ 553.1, *et seq.*

123.     Defendants' unlawful conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

124.     Members of the Classes who purchased Crop Inputs in Iowa were harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Members of the Classes who purchased Crop Inputs in Iowa have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Members of the Classes who purchased Crop Inputs in Iowa are also entitled to all other forms of relief, including actual damages, exemplary damages for willful conduct, and reasonable attorneys' fees and costs.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representatives, that Plaintiff's counsel of record be appointed as Class counsel, and that the Court direct that  notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

B.    That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and the listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

C.    That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged in the Complaint, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program,or device having a similar purpose or effect under Section 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.    That the Court award Plaintiff and the Classes damages against Defendants for their violation of federal and state antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the Court award Plaintiff and the Classes their costs of suit, including

reasonable attorneys' fees and expenses, including expert fees, as provided by law;

F.      That the Court award Plaintiff and the Classes pre- and post-judgment interest as

provided by law and that such interest be awarded at the maximum rate allowable by law

from and after the date of service of this Complaint; and

G.      That the Court direct such other and further relief as the case may require and the

Court may deem just and proper.

## XIV.      DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a

jury trial as to all issues triable by a jury.

Dated: June 2, 2021                     **FEGAN SCOTT LLC**

                                        */s/ Elizabeth A. Fegan*
                                        Elizabeth A. Fegan
                                        FEGAN SCOTT LLC
                                        150 S. Wacker Dr., 24th Floor
                                        Chicago, IL 60606
                                        Ph: 312.741.1019
                                        Fax: 312.264.0100
                                        beth@feganscott.com

                                        Jonathan D. Lindenfeld (*pro hac vice forthcoming*)
                                        FEGAN SCOTT LLC
                                        140 Broadway, 46th Floor
                                        New York, New York 10005
                                        Ph: 332.216.2101
                                        Fax: 312.264.0100
                                        jonathan@feganscott.com

                                        *Counsel for Plaintiff*

31